Filed 1/22/26  P. v. Jacinto CA6

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H051940 |
| Plaintiff and Respondent, | (Monterey County Super. Ct. No. 23CR009189) |
| v. | |
| ANTHONY MICHAEL JACINTO, | |
| Defendant and Appellant. | |

In June 2023, defendant Anthony Michael Jacinto shot and killed a man in Salinas.  Later that same day, Jacinto attacked a woman with a knife.  A jury convicted Jacinto of first degree murder (Pen. Code,[1] § 187, subd. (a)), attempted murder (§§ 187, subd. (a), 664), assault with a deadly weapon (§ 245, subd. (a)), and possession of a firearm by a felon (§ 29800, subd. (a)(1)).  The trial court sentenced Jacinto to an indeterminate prison term of 75 years to life plus a determinate term of 28 years four months.

On appeal, Jacinto raises several claims of trial error.  He challenges the denial of his severance motion, the denial of his motions to exclude postattack video footage of the victims and autopsy photographs, the refusal

---

[1] All further unspecified statutory references are to the Penal Code.

to instruct with CALCRIM No. 225 (CALCRIM 225), the determination that his prior Nevada robbery conviction qualified as a strike prior and serious felony conviction, the refusal to strike his strike prior and sentencing enhancements, and the failure to stay his punishment on one count under section 654. Jacinto further claims that the alleged errors were cumulatively prejudicial.

For the reasons explained below, we disagree with these contentions and affirm the judgment.

## I. FACTS AND PROCEDURAL BACKGROUND

A. *Procedural History*

In January 2024, the Monterey County District Attorney filed an amended information charging Jacinto with the murder of Ismael " 'Angel' " Rodriguez Ledesma (§ 187, subd. (a); count 1), attempted murder of Kristy C.[2] (§§ 187, subd. (a), 664; count 2), assault of Kristy with a deadly weapon (a knife) (§ 245, subd. (a); count 3), and possession of a firearm by a felon (§ 29800, subd. (a)(1); count 4). Attendant to the counts, the information alleged a firearm enhancement (§ 12022.53, subd. (d)) attached to count 1; a great bodily injury (GBI) enhancement (§ 12022.7, subd. (a)) and a deadly weapon enhancement (§ 12022, subd. (b)(1)) attached to count 2; and a GBI enhancement (§ 12022.7, subd. (a)) attached to count 3. In addition, the information alleged that Jacinto had suffered a strike prior conviction (strike prior) (§§ 667, subd. (d), 1170.12, subd. (b)) and a prior serious felony conviction (serious felony enhancement) (§ 667, subd. (a)(1)) based on a 2014 Nevada conviction of robbery with the use of a deadly weapon (Nev. Rev.

---

[2] We refer to the surviving victim and a civilian trial witness by first name and last initials and subsequently by first name to protect their privacy interests. (Cal. Rules of Court, rule 8.90(b)(4), (10); all further unspecified rule references are to the California Rules of Court.)

Stat. §§ 193.165, 200.380) (Nevada robbery conviction). The information also alleged various aggravating circumstances for sentencing (rules 4.421(a)(1)–(3), (b)(1)–(4)).[3]

In February 2024, the jury found Jacinto guilty of the charged counts, including first degree murder on count 1.[4] The jury further found true the attached enhancement allegations.

Jacinto waived his right to a jury trial on the strike prior, serious felony enhancement, and aggravating circumstances allegations. In a bifurcated proceeding, the trial court found that the Nevada robbery conviction qualifies as a strike prior and serious felony. The court also found true the alleged aggravating circumstances.

At a March 2024 sentencing hearing, the trial court denied Jacinto's request under *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497 (*Romero*) and section 1385 to dismiss the strike prior (*Romero* motion). The court imposed a total indeterminate sentence of 75 years to life on count 1, consisting of 25 years to life, doubled pursuant to the strike prior, plus 25 years to life for the attached firearm enhancement (§ 12022.53, subd. (d)). On count 2, the court imposed a total determinate term of 22 years, consisting of the upper term of nine years, doubled pursuant to the strike prior, plus three years for the GBI enhancement (§ 12022.7, subd. (a)) and one year for the deadly weapon enhancement (§ 12022, subd. (b)(1)). On count 3, the court imposed (but stayed under section 654) a total term of 11 years, consisting of

---

[3] During trial, upon the prosecutor's motion, the trial court dismissed the rule 4.421(b)(4) aggravating circumstance allegation.

[4] The jury returned the first degree murder verdict based on a theory of a willful, deliberate, and premeditated killing of Ledesma (§ 189, subd. (a)). However, the jury failed to find that Jacinto committed the attempted murder of Kristy (count 2) with premeditation and deliberation.

the upper term of four years, doubled pursuant to the strike prior, plus three years for the GBI enhancement (§ 12022.7, subd. (a)). On count 4, the court imposed a total term of one year four months, consisting of eight months (one-third of the middle term), doubled pursuant to the strike prior. For the serious felony enhancement (§ 667, subd. (a)(1)), the court imposed an additional, consecutive five years. Thus, as the court stated, "[t]he total aggregate term [is] 28 years and 4 months determinate, plus 75 years to life indeterminate."

B. *Prosecution Evidence at Trial*[5]

1. <u>Ledesma Shooting</u>

Around 12:30 a.m. on June 26, 2023,[6] witness "Jane Doe" heard approximately "seven or eight" gunshots as she sat in a tent near victim Ledesma's tent. The tents were situated along some train tracks in Salinas. Jane Doe did not hear any arguing or shouting or anyone walking or running around the time of the shooting. Jane Doe's boyfriend, witness "John Doe No. 1" (Doe 1), likewise heard "five or four" gunshots as he walked from a nearby gas station toward the tents. Doe 1 saw a young "[w]hite complected" man walking away from the area "real fast." The man had a hood on, and Doe 1 was "pretty sure" the man was wearing a gray sweater and black pants. After passing by Doe 1, the man began running. Doe 1 saw the man throw something and heard "[m]etal hitting metal." As Doe 1 approached the tents, he saw Ledesma exit his tent naked. Ledesma said he had been shot and fell to the ground. Jane Doe saw that Ledesma was "gurgling in his own blood, like he couldn't breathe." She also saw "a girl" near Ledesma. Doe 1

---

[5] Jacinto did not present any evidence in his defense.
[6] Unless otherwise indicated, all dates were in 2023.

saw two or three "girls"—all of whom subsequently left the area. Neither Jane Doe nor Doe 1 saw Ledesma or the girls with a gun. Doe 1 called 911.

Salinas Police Department officers responded to the scene. Officer Johnathan Flores saw that Ledesma had a gunshot wound in his back. Flores placed a "chest seal" over Ledesma's wound. Footage from Flores's body-worn camera depicted Ledesma groaning. According to Flores, Ledesma could not speak in an understandable fashion. Medical personnel transported Ledesma to a hospital. He died from a "distant gunshot wound" to the mid-right side of his back.

Officer Richard Macias observed blood inside Ledesma's tent. Macias found six expended cartridge casings at the scene—five of which were near the entrance of Ledesma's tent. With the assistance of a police dog, Officer Blake Ziebell found an unloaded .380 caliber semi-automatic Bersa handgun along a chain-link fence that was covered in ivy and led to the train tracks.

The police collected video footage recorded by nearby surveillance cameras. The footage showed that soon after the shooting, a person wearing a black hooded sweatshirt and gray pants walked away from the scene. In one of the videos, the person approaches the rear passenger door of a car and says " 'My bad' " and that "he was told someone was going to be waiting for him there." In another video, the police were able to "zoom in and see [the person's] face;" that person was Jacinto. Detective John Richardson testified that no video footage collected by the police showed anyone other than Jacinto leaving the area of the alleyway that led to the shooting scene.

Location data linked to Jacinto's cell phone placed it in the vicinity of the scene several minutes before the shooting. The data also showed the phone moving away from the scene soon after the shooting.

California Department of Justice (DOJ) criminalist Ethan Barber examined the firearm evidence collected by police. Barber concluded that all six of the expended cartridge casings were fired by the same gun (i.e., the Bersa handgun), and the bullet recovered from Ledesma's body at the autopsy was fired from that gun.

Forensic testing of the gun's grip and trigger revealed DNA mixtures that included Jacinto and unknown persons. A DNA mixture found on one of the cartridge casings revealed "limited support for inclusion" of Jacinto, while DNA found on the other cartridge casings was either not suitable for comparison, excluded Jacinto as a contributor, or produced "uninformative" results.[7]

### 2. Stabbing of Kristy

"[A]bout 1242 hours" on June 26, Monterey County Sheriff's Deputy Matthew Bradford responded to a call concerning a suspicious person. At that time, Deputy Bradford did not have any information that Jacinto might be a suspect in a homicide. When Bradford encountered Jacinto, Jacinto "was calm, cooperative, [and] nonchalant." Jacinto said he was lost and trying to get back to his girlfriend's house in Salinas. As a courtesy, Bradford gave Jacinto a ride to an intersection in Salinas.

Later that day, Jacinto showed up at the home of his girlfriend's aunt, Kristy, in Salinas. Kristy and her friend Andy K. were there. Kristy had met Jacinto for the first time a couple weeks earlier, and Jacinto had been at Kristy's house about three times before.

Jacinto "said that he had been out all night long, his feet hurt from walking, [and] he was looking for his girlfriend." Kristy felt "uncomfortable

---

[7] For purposes of count 4 (possession of a firearm by a felon), Jacinto stipulated at trial that he had previously been convicted of a felony.

6

with [Jacinto] being there because his girlfriend wasn't there and he seemed [] in a desperate manner." According to Kristy, Jacinto looked "[e]xhausted and tired, hungry kind of," and he said that "he had been eating vegetables all night." Andy likewise thought Jacinto looked like he was tired and needed some rest.

Andy invited Jacinto to stay while his cell phone charged and offered Jacinto clean clothes and a shower (which Jacinto did not take). Andy testified that Jacinto seemed "a little bit" irritated when Kristy left for a time with Jacinto's phone (which had been charging in Kristy's car). After Kristy returned home, she handed Jacinto his phone; he did not say anything about her having taken his phone. Andy served them tacos for dinner. Andy and Kristy noticed that Jacinto was not eating. Kristy said, " 'The tacos are good, eat up.' "

Kristy testified that Jacinto walked to the kitchen and returned to the living room holding a large kitchen knife. Kristy asked Jacinto what he was doing. Jacinto "didn't say anything" in response. Andy told Jacinto to put the knife down and leave the house. Jacinto did not comply. Instead, with a "numb look" on his face and without saying a word, Jacinto lunged toward Kristy and stabbed her in the abdomen. Kristy begged Jacinto not to stab her again. Andy ran from the house. Jacinto pulled the knife out of Kristy, stared at her, "stood there for a while," wiped off the knife, put it on the table, and walked away.

Andy testified (in contrast to Kristy's testimony) that when he asked Jacinto to put down the knife, Jacinto did so. According to Andy, Jacinto "was a little concerned about a wallet that had went missing." As Andy got up to look for Jacinto's wallet (which was in the bathroom along with

7

Jacinto's belongings), Jacinto picked up the knife and stabbed Kristy. To Andy, Jacinto "seemed confused the whole time."

Kristy eventually exited her house. She had difficulty breathing and went down to the ground. Kristy arrived at the hospital unconscious, and her heart stopped beating. Medical personnel revived Kristy. She required two surgeries to treat her injuries and was hospitalized for weeks.

Witness "John Doe 2" (Doe 2) lived across the street from Kristy's house. Around 7:00 p.m. on June 26, Andy approached Doe 2 outside his house and said a woman had been stabbed. Doe 2 called 911. While talking to the 911 dispatcher, Doe 2 noticed a man (later identified as Jacinto) across the street, "pacing back and forth" and looking "distraught." Doe 2 entered his house. Jacinto approached Doe 2's house and knocked on the front door. Jacinto appeared to talk on his cell phone, but it "[didn't] sound like he[] [was] talking to anyone . . . other than himself." Doe 2 thought that Jacinto's behavior was abnormal.[8]

Officer Ziebell was dispatched to the scene of the stabbing. He located Jacinto nearby and apprehended him. Jacinto had blood on his clothing. Ziebell and another police officer testified that Jacinto did not exhibit any signs or symptoms of a mental health crisis or drug or alcohol impairment. According to Ziebell, Jacinto did not appear confused, disoriented, or "high."

## II. DISCUSSION

Jacinto contends the trial court erred by: (1) denying his motion to sever counts 1 and 4 from counts 2 and 3; (2) denying his in limine motions to exclude postattack video footage of the victims and autopsy photographs; (3) refusing to instruct with CALCRIM 225; (4) deciding that Jacinto's Nevada

---

[8] At trial, the prosecutor played the video footage captured by Doe 2's doorbell camera.

robbery conviction qualified as a strike prior and serious felony conviction; (5) refusing to strike the strike prior and sentencing enhancements; and (6) declining to stay the punishment on count 4 under section 654. Jacinto further claims that the alleged errors were cumulatively prejudicial.

We address Jacinto's claims in turn.

A. *Denial of Severance*

    1. <u>Additional Background</u>

Pretrial, Jacinto filed a motion for separate trials on counts 1 and 4 (regarding the Ledesma shooting) and counts 2 and 3 (regarding the stabbing of Kristy). Jacinto argued that he "will be denied his right to due process and to a fair trial on all counts if the jury hears all of the evidence stemming from [c]ount one, and at the same time hears all of the evidence related to counts two and three. The jury is more likely to believe [Jacinto] is guilty in a count related to one of the incidents."

The district attorney opposed Jacinto's motion. The district attorney argued there was good cause to consolidate the charges and Jacinto failed to show the prejudice necessary for severance. The district attorney noted that the charged offenses were "of the same class of crimes" and the "evidence from each event would also likely be admissible pursuant to Evidence Code section 1101."

The trial court denied Jacinto's motion. The court found that: (1) counts 1 and 4 "are of the same class" as and "possess common characteristics" with counts 2 and 3; (2) "the offenses are connected in their commission as they are linked by a common element of substantial importance"; (3) the evidence regarding each underlying incident would likely be admissible under Evidence Code section 1101, subdivision (b) on the issue of homicidal intent; (4) the prosecution of Jacinto does not present a situation

in which a weak case is joined with a strong case; and (5) "[s]trong evidence of a lesser but inflammatory crime is not being used to bolster a weak prosecution case on another crime." The court concluded: "Based on the factors that the [c]ourt must consider in determining whether or not severance is appropriate, the [c]ourt has found that [Jacinto] has failed to make an adequate showing of a substantial danger of prejudice" in trying the counts together.

Later, when providing final jury instructions, the trial court instructed the jury that each charged count "is a separate crime" and that the jury "must consider each count separately and return a separate verdict for each one." (CALCRIM No. 3515.)

### 2. Legal Principles

"The law favors trying all charged offenses together. [Citation.] Section 954 provides in pertinent part: 'An accusatory pleading may charge two or more different offenses . . . of the same class of crimes or offenses, under separate counts.' Murder and attempted murder, both of which are 'assaultive crimes,' are offenses ' " 'of the same class' " ' and may be joined for trial. [Citations.] A denial of severance is reviewed for abuse of discretion. [Citation.] ' "The state's interest in joinder gives the court broader discretion in ruling on a motion for severance than it has in ruling on admissibility of evidence." ' [Citation.] Where . . . the statutory requirements for joinder are met, the defendant must make a clear showing of prejudice to demonstrate that the trial court abused its discretion." (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 746 (*Holmes*); see also *People v. Thomas* (1990) 219 Cal.App.3d 134, 139–140 [attempted murder, felon in possession of a firearm, and robbery pertain to the same class of crimes].)

10

"In reviewing such a ruling, we consider:  '(1) whether evidence of the crimes to be jointly tried is cross-admissible; (2) whether some charges are unusually likely to inflame the jury against the defendant; (3) whether a weak case has been joined with a stronger case so that the spillover effect of aggregate evidence might alter the outcome of some or all of the charges; and (4) whether any charge carries the death penalty or the joinder of charges converts the matter into a capital case.' " (*Holmes*, *supra*, 12 Cal.5th at p. 746.)

"The least degree of similarity [between the offenses] is required in order to prove intent.  [Citation.]  '[T]he recurrence of a similar result . . . tends (increasingly with each instance) to negative accident or inadvertence or self-defense or good faith or other innocent mental state, and tends to establish (provisionally, at least, though not certainly) the presence of the normal, i.e., criminal, intent accompanying such an act . . ..'  [Citation.] In order to be admissible to prove intent, the [] misconduct must be sufficiently similar to support the inference that the defendant ' "probably harbor[ed] the same intent in each instance." ' " (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402; see also *People v. Demetrulias* (2006) 39 Cal.4th 1, 15–17.)

"Cross-admissibility is not, however, a precondition to joinder of charges.  '[S]ection 954.1 expressly provides that "where two or more accusatory pleadings charging offenses of the same class of crimes or offenses have been consolidated, evidence concerning the one offense or offenses *need not* be admissible as to the other offense or offenses before the same trier of fact."  (Italics added.)  Thus, "cross-admissibility is not the sine qua non of joint trials." '  [Citation.]  While the presence of such evidence ' "is normally sufficient to dispel any suggestion of prejudice and to justify a trial court's refusal to sever properly joined charges" ' [citation], the absence of cross-

11

admissible evidence does not bar joinder." (*People v. O'Malley* (2016) 62 Cal.4th 944, 968 (*O'Malley*).)

"Even if a defendant fails to demonstrate the trial court's joinder ruling was an abuse of discretion when it was made, reversal may nonetheless be required if the defendant can demonstrate that 'the joint trial resulted in such gross unfairness as to amount to a due process violation.' " (*People v. Landry* (2016) 2 Cal.5th 52, 77.)

> 3. <u>Analysis</u>

Jacinto claims the trial court abused its discretion and violated his constitutional rights by refusing to sever counts 1 and 4 from counts 2 and 3. He asserts that, contrary to the court's findings, the evidence regarding counts 1 and 4 was not cross-admissible with counts 2 and 3, and the Kristy stabbing case was "much stronger" than the Ledesma shooting case. The Attorney General disagrees with both assertions. He further argues that the trial court correctly found that this case did not involve a situation where the charges on the two incidents would inflame the jury and notes that none of the charges implicated the death penalty (which Jacinto does not dispute).

We discern no error in the trial court's denial of Jacinto's motion for separate trials. Irrespective of whether the Ledesma shooting evidence and Kristy stabbing evidence would have been cross-admissible on the issue of Jacinto's intent, we are not convinced that any other factors support an abuse of discretion in the denial of severance. (See *People v. Ybarra* (2016) 245 Cal.App.4th 1420, 1435 [" '[E]ven if cross-admissibility did not support consolidation of the cases, the absence of cross-admissibility alone would not be sufficient to establish prejudice where (1) the offenses were properly joinable under section 954, and (2) no other factor relevant to the assessment of prejudice demonstrates an abuse of discretion.' "].)

We do not agree with Jacinto that the evidence against him on the stabbing of Kristy was significantly stronger than the evidence that he murdered Ledesma. The prosecution presented copious evidence proving Jacinto shot Ledesma, including Doe 1's testimony about seeing a person fleeing the scene and discarding something metallic, the DNA evidence linking Jacinto to the discarded gun that was matched to the recovered bullet and cartridge casings, the cell phone location data confirming Jacinto's presence in the area before, during, and after the shooting, and the surveillance footage depicting Jacinto leaving the area.[9] That this evidence only indirectly established Jacinto fired the shot that killed Ledesma does not make the case on counts 1 and 4 appreciably weaker than that on counts 2 and 3 (which included direct eyewitness evidence establishing that Jacinto stabbed Kristy). (See *People v. Pierce* (1979) 24 Cal.3d 199, 210 ["Circumstantial evidence may be sufficient to connect a defendant with the crime and to prove his guilt beyond a reasonable doubt."]; *People v. Morrow* (1882) 60 Cal. 142, 144–145 [circumstantial evidence may be as strong as direct evidence in proving guilt].) Both cases against Jacinto were strong; thus, there was little to no likelihood of a " 'spillover effect' " that might have altered the outcome of the charges. (See *Holmes*, *supra*, 12 Cal.5th at p. 746.)

Furthermore, the trial court properly found that the charges regarding each incident were not likely to inflame the jury against Jacinto. The murder, attempted murder, and assault with a deadly weapon charges were equally base. Both incidents involved an attack on an unarmed victim, and Kristy would have died but for the life-saving efforts of medical personnel at the hospital. Under these circumstances, the trial court reasonably

---

[9] In closing argument, Ledesma's defense counsel conceded that Jacinto was the person depicted in the surveillance footage shown to the jury.

concluded that neither incident was likely to inflame the jury against Jacinto or render the jurors unable to separately consider the evidence on each count. (See *People v. Musselwhite* (1998) 17 Cal.4th 1216, 1245; *People v. Marshall* (1997) 15 Cal.4th 1, 28.)

For these reasons, we conclude Jacinto failed to make a clear showing of prejudice, the court did not abuse its discretion when it denied his motion to sever the charges, and the joint trial of the charges did not violate Jacinto's constitutional rights to due process, a fair trial, or fair sentencing. (See *O'Malley*, *supra*, 62 Cal.4th at pp. 969–970.)

B. *Admission of Videos and Autopsy Photographs*

1. <u>Additional Background</u>

Jacinto moved in limine under Evidence Code section 352 to preclude the display or admission of: (1) any video depicting Kristy while she was awaiting the arrival of paramedics after the stabbing (motion No. 23); (2) any video depicting Ledesma while he was awaiting the arrival of paramedics after the shooting (motion No. 24); and (3) autopsy photographs depicting Ledesma (motion No. 26). Jacinto contended the identified "evidence serves no purpose and will only inflame the jury to be prejudiced against [him]."

a. Motion No. 26

At a pretrial hearing on the in limine motions, the trial court deferred ruling on motion Nos. 23 and 24, pending a review of the relevant video footage. Regarding motion No. 26, the court described the six autopsy photographs offered by the prosecution for introduction (out of more than 100 photos taken at the autopsy): "[T]wo of the photographs are of Mr. Ledesma before any type of operation or procedure has been performed. He is laying sideways on a gurney. There is a mark, it looks like a dark mark, on his back. [¶] The third . . . photograph, is a photograph of [] an enlargement

14

essentially of that area, a close-up shot, again depicting the bullet hole in his back. There is also, it looks like, a medical device that's essentially used to measure that bullet hole wound. [¶] There is a photograph of Mr. Ledesma, again laying on the gurney in that picture. You can see medical personnel, the midsection of their body and their hands. You can see Mr. Ledesma's chest and it appears to be where the bullet hole exited. [¶] There's another photograph, again a similar picture. Mr. Ledesma is laying on his chest on a gurney. And again, this is showing where the bullet hole exited. [¶] The final photograph is after part of the autopsy surgery has been performed. There is a significant cut into Mr. Ledesma's chest area. You can see blood and fatty tissue. And my understanding is the relevance of that is that you can also see a portion of the bullet protruding from his chest."[10]

As to the final (sixth) photograph, the trial court found that "although there is . . . some relevance to the bullet, the probative value is substantially outweighed by the prejudicial effect." The court excluded that photo.

Defense counsel "object[ed] to more than one photograph" being introduced given "the cumulative effect of the jury seeing more than one photograph of Mr. Ledesma once he has died." Counsel further expressed a preference for a photograph "before there's any cuts . . . and it's just of Mr. Ledesma and his back and where the wound is."

The trial court ruled that the remaining five photographs could be used at trial. The court explained: "There is nothing in those photos -- again, they're pre-operation for purposes of the autopsy. There's nothing in those photos that the [c]ourt finds would be unduly prejudicial. And given that

---

[10] At trial, the pathologist testified that Ledesma's body did not have an exit wound. Rather, a single bullet was located "under the skin of [Ledesma's] right chest wall" and recovered "by surgical incision."

15

there were hundreds of photographs and only [five] being used, I think that's appropriate."

At trial, during the pathologist's testimony and without further defense objection, the prosecution presented four autopsy photographs (People's exhibit Nos. 122–125).[11]

### b. Motion No. 23

Before the prosecution began presenting its case, the trial court addressed motion Nos. 23 and 24. Regarding motion No. 23, the court noted that it had met with counsel and reviewed an approximately four-minute body-worn camera video that depicted Kristy after she had been stabbed and culminated in Kristy being taken on a stretcher to an ambulance. The prosecutor argued that the video was "highly relevant" because the People had "to prove great bodily injury and there is no better evidence of GBI than the actual video of the victim suffering audibly and visibly from that injury." The prosecutor further noted that the proposed footage would end "as the paramedics are beginning to cut the victim's clothes off so you can see the stab wound but her privacy is still protected."

Defense counsel argued that the probative value of the video was outweighed by its prejudicial impact and tendency to bias and inflame the jury's sympathy for Kristy. Counsel noted that there would be medical records and testimony introduced regarding the extent of Kristy's injury, which would suffice to show great bodily injury. Counsel further argued that Kristy's expressions of pain and difficulty breathing do not "necessarily" show great bodily injury "because a person could be in pain for many reasons and

---

[11] The admitted photographs are not reproduced in the appellate record, and neither party on appeal has sought to transmit those photographs from the trial court to this court for our review. (See rules 8.224, 8.320(e).)

16

afterwards, once a doctor has examined them and rendered an opinion and things like that, it may turn out that it is not necessarily a GBI."

The trial court ruled as follows: "I reviewed four minutes of [the video]. It does show the female victim lying on the ground. She's wearing jeans and a shirt. There are a couple of other individuals standing around her. Police arrive on the scene, paramedics have not yet arrived at the very beginning portion of the video. [¶] During the video, she does indicate that she's in pain and she's having difficulty breathing. There's nothing on the video, such as a really graphic, gruesome injury, that . . . is visible. [¶] . . . [A]lthough clearly the female victim is in pain and there is some prejudice to the [d]efense in the form of perhaps jurors having sympathy for this individual, the [c]ourt does find that it does have significant probative value on the issue of great bodily injury. And the standard is, is the probative value substantially outweighed by the prejudicial effect? [¶] Given the non-gruesome nature of the injury, the relatively short length of the video, the [c]ourt finds that it is admissible."

During Kristy's testimony at trial, the prosecution played the body-worn camera video footage of Kristy (People's exhibit No. 94).[12]

    c.  Motion No. 24

Regarding motion No. 24, the trial court stated that it and counsel had watched two body-worn camera videos proposed for introduction. The court noted that the first, two minute and 45 second-long video showed Ledesma "on the ground during police contact with him." The second, two minutes-

---

[12] A transcript of the admitted video footage is included in the appellate record. Neither party on appeal has sought to transmit the video exhibit itself from the trial court to this court for our review.

long video showed the police arriving on scene, Ledesma on the ground "appear[ing] to be in pain," and the location of various tents at the scene.

The prosecutor argued that the location of and distance between the tents, as well as Ledesma's position on the ground in relation to the tents are "highly relevant" facts and "negate[] any self-defense claim." The prosecutor also argued that the "second video more accurately depicts the victim on the ground after he's been shot." The prosecutor noted that she had to prove that Ledesma was "particularly vulnerable" (see rule 4.421(a)(3)) and argued that the second video supported vulnerability because it showed Ledesma "was naked at the time that he was shot in the back." The prosecutor additionally clarified that she was "asking to admit a very small portion from each video."

Defense counsel countered that police officers could testify about the distance between the tents and that showing the distances "visually" did not "seem really necessary." In the same vein, counsel argued that police officers could testify about Ledesma's nakedness and the video might elicit a "reaction that would cause a prejudice to Mr. Jacinto."

The trial court ruled as follows: "So the [c]ourt is going to allow both videos. There, of course, is some concern for prejudice against the defendant. You can see the victim on the ground and he is obviously in pain, but the standard is, is the probative value substantially outweighed by the prejudicial effect? [¶] Here, the [c]ourt finds that both of these videos are very probative. . . . [A]lthough, of course, the People have other ways they can put on the evidence, they are able to elect how they want to do it and I think providing video of where the tents are located really gives the jury a much more clear understanding of the dimensions of the area as opposed to an abstract distance that would be testified to [by] an officer. [¶] It is also probative on the issue of the [victim] being particularly vulnerable as you can

18

see that he was naked and shot in the back. [¶] So conducting the balancing analysis, especially considering that each of these videos are relatively brief, there is no, again for lack of a better phrase, gory injuries or blood all over the place so I think that minimizes the prejudicial effect as well. [¶] So I do find that they're relevant and admissible."

At trial, the prosecution played the officers' body-worn camera video footage (People's exhibit Nos. 8 & 14).[13]

### 2. Legal Principles

Evidence is relevant if it has a "tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) However, a trial court may exclude relevant evidence if the risk of undue prejudice, undue consumption of time, confusion of the issues, or misleading the jury substantially outweighs its probative value. (*Id*., § 352; *People v. Cudjo* (1993) 6 Cal.4th 585, 609.) "For this purpose, 'prejudicial' is not synonymous with 'damaging,' but refers instead to evidence that ' "uniquely tends to evoke an emotional bias against defendant" ' without regard to its relevance on material issues." (*People v. Kipp* (2001) 26 Cal.4th 1100, 1121 (*Kipp*).)

"A trial court's exercise of discretion in admitting or excluding evidence . . . will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10.)

---

[13] Transcripts of the admitted video footage are included in the appellate record. Neither party on appeal has sought to transmit the video exhibits themselves from the trial court to this court for our review.

Appellate courts are " ' "often asked to rule on the propriety of the admission of allegedly gruesome photographs. [Citations.] At base, the applicable rule is simply one of relevance, and the trial court has broad discretion in determining such relevance. [Citation.] ' "[M]urder is seldom pretty, and pictures, testimony and physical evidence in such a case are always unpleasant" ' [citation], and we rely on our trial courts to ensure that relevant, otherwise admissible evidence is not more prejudicial than probative." ' " (*People v. Thomas* (2023) 14 Cal.5th 327, 372 (*Thomas*).) " 'In a prosecution for murder, photographs of the murder victim and the crime scene are always relevant to prove how the charged crime occurred . . ..' [Citation.] 'The prosecution is not obliged to prove its case solely from the testimony of live witnesses; "the jury is entitled to see details of the victims' bodies to determine if the evidence supports the prosecution's theory of the case." ' " (*Ibid.*)

3. <u>Analysis</u>

Jacinto contends the trial court prejudicially abused its discretion by allowing the prosecutor to present more than one autopsy photograph. Jacinto asserts that the prosecutor failed to provide a theory of relevance for the photos, the cause of Ledesma's death was not disputed, and "[a]ny additional autopsy photos were far more prejudicial than probative and merely cumulative." We are not persuaded that the trial court erred.

The autopsy photographs were relevant to prove the circumstances of Ledesma's death by a distant gunshot to his back, to assist the jury's understanding of the pathologist's testimony regarding the cause and manner of death, and to support the prosecution's theory that the killing was willful, deliberate, and premeditated. (See *People v. Cage* (2015) 62 Cal.4th 256, 283 (*Cage*).) Furthermore, the probative value of the photos was not

20

substantially outweighed by the potential of undue prejudice because, according to the trial court's description, these pre-autopsy operation photos were not particularly gruesome or disturbing and only a small number of such photos were admitted. (See *Thomas*, *supra*, 14 Cal.5th at p. 373; *People v. Parker* (2022) 13 Cal.5th 1, 42; see also *People v. Winbush* (2017) 2 Cal.5th 402, 459 ["Nor were the autopsy photos impermissibly cumulative because there was no dispute about the cause of death."].) The trial court's decision to admit the autopsy photographs fell well within the court's broad discretion.

Regarding the body-worn camera video footage depicting Ledesma, Jacinto argues that the position of the tents and Ledesma's vulnerability could have been shown to the jurors through witness testimony and other less prejudicial photographs. He further asserts that "[t]here was no critical, disputed issue that the video aimed to resolve," and the video footage was highly prejudicial, as evidenced by the prosecutor's statement at the sentencing hearing that the footage showed " 'Ledesma's last moments were agonizing. He tried to reach safety next door but he failed. He screamed in pain in the dirt and his life could not be saved.' "

We agree with the trial court that the video footage (as described in the appellate record) was probative of materially significant issues in the case, namely, the location of the tents and Ledesma's vulnerability to the attack. These circumstances supported the prosecution's theory that Jacinto shot Ledesma with premeditation and deliberation and without any provocation. (See *People v. Sattiewhite* (2014) 59 Cal.4th 446, 471 [concluding that crime scene photographs were relevant to establish the killer's mental state].) Additionally, the video offered a more direct and detailed view of the scene and Ledesma's condition than still images or testimony from police officers would have. (See *People v. Pride* (1992) 3 Cal.4th 195, 243–244 [the

21

prosecution is not obliged to use testimony in lieu of probative crime scene photos and video].)

Notwithstanding the prosecutor's statement at Jacinto's sentencing about Ledesma's agony, Jacinto fails to demonstrate any inaccuracy in the trial court's description of the videos as lacking gore. Moreover, the transcripts of the admitted videos only note Ledesma "groaning." Based on the record before us, we cannot conclude the trial court abused its discretion when it decided the probative value of the videos was not substantially outweighed by the risk of undue prejudice.

Regarding the body-worn camera video footage depicting Kristy after the stabbing, Jacinto argues that testimony from Kristy and other witnesses "would more than adequately show GBI by discussing the nature and severity of injury itself" and "without actually showing the injury," the footage "had the least probative value" of the available evidence. Jacinto also argues that the footage was "highly prejudicial by causing the jury to have sympathy for" Kristy and "there was no critical, disputed issue that the video aimed to resolve."

We are not persuaded the trial court erred in admitting the footage of Kristy after Jacinto stabbed her. That footage (as described by the court) was relevant and had substantial probative value for proving that Jacinto inflicted great bodily injury in committing the attempted murder (§ 12022.7, subd. (a)). By showing Kristy's pain and distress, the footage directly established whether Kristy suffered a significant or substantial physical injury (CALCRIM No. 3160) and corroborated Kristy's and her doctor's testimony about the seriousness of Kristy's injury. (See *People v. Zambrano* (2007) 41 Cal.4th 1082, 1149, disapproved on another ground by *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) Relatedly, prosecutors are not

obliged to prove their case solely with live witnesses, and the jury is entitled to learn the details of a victim's injuries to judge the prosecution's accusations. (See *Thomas*, *supra*, 14 Cal.5th at p. 372.)

On the record before us, we discern no reason to conclude the trial court acted arbitrarily when it found that "[g]iven the non-gruesome nature of the injury," the video's "significant probative value on the issue of great bodily injury" was not substantially outweighed by its prejudicial effect. The transcript substantiates the court's description of Kristy's pain and difficulty breathing and the sympathy the video would generate toward her. But the transcript and the court's overall description of the video do not show that the video would have uniquely tended to evoke an emotional bias against Jacinto without regard to the video's relevance on the material issues. (See *Kipp*, *supra*, 26 Cal.4th at p. 1121.) We thus reject Jacinto's contention that the trial court abused its discretion by admitting the video at trial.

For these same reasons, Jacinto has failed to show any violation of his due process rights by the admission of the autopsy photographs and body-worn camera video footage depicting Kristy and Ledesma. The admission of this probative evidence was both appropriate and unexceptional, and did not render Jacinto's trial fundamentally unfair. (See *People v. Jones* (2013) 57 Cal.4th 899, 949; *People v. Steskal* (2021) 11 Cal.5th 332, 367; see also *Cage*, *supra*, 62 Cal.4th at p. 284.)

C. *CALCRIM 225*

Jacinto contends the trial court prejudicially erred by refusing to instruct the jurors with CALCRIM 225 regarding circumstantial evidence on intent or mental state. The Attorney General responds that the court properly instructed Jacinto's jury and, regardless, any error was harmless.

23

1. <u>Additional Background</u>

Pretrial, Jacinto asked the trial court to instruct the jurors on their reliance on circumstantial evidence using CALCRIM Nos. 224 and 225. The prosecution, by contrast, requested only CALCRIM No. 224 (CALCRIM 224).

At a jury instruction conference, the trial court noted the disparate requests and said "the primary difference between the two [instructions], at least according to the bench guide, is whether the -- well, the only issue that the circumstantial evidence references or refers to or is offered upon is someone's intent or mental state. If that is the situation, then [CALCRIM] 225 should be given. If that is not the situation, then [CALCRIM] 224 should be given."

Defense counsel explained that the defense "is requesting [CALCRIM] 225 because in the attempted murder count it's the [d]efense position that the mental state or intent is the only element that rests substantially or entirely on circumstantial evidence. The rest is obviously, I think, pretty direct evidence as far as what occurred, but the question is of the intent. So that's why we were requesting it, because of that count."

The trial court responded by noting that "[u]sually, it's only appropriate to give one of these instructions." In addition, because the instant case involved one general intent crime (count 3 [assault of Kristy with a deadly weapon]) and three specific intent crimes (counts 1, 2 & 4), the court believed instruction with CALCRIM 224 "would be more appropriate." The court further noted that defense counsel could "argue the fact that, with respect to the attempted murder, the mental state relies exclusively or primarily on circumstantial evidence."

The prosecutor agreed with the trial court and added: "[CALCRIM] 224 is the appropriate instruction as identity is also an issue, not just intent

24

and mental state. [¶] For the homicide, I also would expect that both sides are going to be arguing circumstantial evidence for evidence of intent."

The trial court declined to instruct with CALCRIM 225 and said that instruction under CALCRIM 224 "certainly wouldn't preclude any argument with respect to your theory."

The CALCRIM 224 instruction provided to Jacinto's jurors read as follows: "Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt. [¶] Also, before you may rely on circumstantial evidence to find the defendant guilty, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant is guilty. If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions points to innocence and another to guilt, you must accept the one that points to innocence. However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable."

In closing argument, defense counsel noted the circumstantial evidence instruction when arguing about "the problems with the evidence in [c]ount 1" and the existence of reasonable doubt as to the identity of the shooter. When arguing against count 2, counsel explained that "in this case the only way to prove that intent [to kill] . . . is through circumstantial evidence. And remember, the instruction tells you if there are two reasonable interpretations you must choose the interpretation that points to Mr. Jacinto's innocence." Counsel further argued that certain evidence about Jacinto's conduct "[did] not support an intent to kill, let alone a deliberate, premeditated, willful intent to kill."

25

In rebuttal argument, the prosecutor asserted that "both direct and circumstantial evidence are equally good types of evidence" (alluding to the jury instruction defining direct and circumstantial evidence (CALCRIM No. 223)). The prosecutor additionally noted that the circumstantial evidence instruction specifically directs the jurors to "accept only reasonable conclusions and critically reject the unreasonable." After mentioning defense counsel's concession that Jacinto had stabbed Kristy and arguing that the evidence showed an intent to kill, the prosecutor said, "The only reasonable conclusion is that this defendant wanted to kill Kristy. There's no other reason to hold that knife in [his] hands and watch the life drain from her eyes as she's begging for her life."

As noted *ante* (see pt. I.A.), in deciding count 2, the jury failed to find that Jacinto committed the attempted murder with the additional mental state of premeditation and deliberation.

2. <u>Legal Principles</u>

" 'In criminal cases, even in the absence of a request, a trial court must instruct on general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case.' " (*People v. Townsel* (2016) 63 Cal.4th 25, 58.) This obligation includes the duty to instruct on the evaluation of circumstantial evidence " ' "when the prosecution substantially relies on circumstantial evidence to prove guilt." ' " (*People v. Contreras* (2010) 184 Cal.App.4th 587, 591 (*Contreras*).)

"A claim of instructional error is reviewed de novo." (*People v. Mitchell* (2019) 7 Cal.5th 561, 579; see also *People v. Waidla* (2000) 22 Cal.4th 690, 733.) "The proper test for judging the adequacy of instructions is to decide whether the trial court 'fully and fairly instructed on the applicable law . . . .' [Citation.] ' "In determining whether error has been committed in giving or

26

not giving jury instructions, we must consider the instructions as a whole . . . [and] assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given. [Citation.]" ' [Citation.] 'Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.' " (*People v. Martin* (2000) 78 Cal.App.4th 1107, 1111–1112.)

" 'The meaning of instructions is no[t] . . . determined under a strict test of whether a "reasonable juror" could have understood the charge as the defendant asserts, but rather under the more tolerant test of whether there is a "reasonable likelihood" that the jury misconstrued or misapplied the law in light of the instructions given, the entire record of trial, and the arguments of counsel.' " (*People v. Mathson* (2012) 210 Cal.App.4th 1297, 1312, italics omitted.)

   3. <u>Analysis</u>

Jacinto claims that in addition to providing CALCRIM 224, the trial court should have instructed the jurors with CALCRIM 225 for count 2 (attempted murder). He argues that the error in refusing CALCRIM 225 was prejudicial at least as to count 2 because of "the complex nature of circumstantial evidence" and the important function served by CALCRIM 225. Additionally, Jacinto asserts that the failure to give CALCRIM 225 relieved the prosecution of its burden to prove all elements of the offense beyond a reasonable doubt and violated his constitutional rights to due process, a fair trial, and fair sentencing.

  We are not persuaded. " 'CALCRIM No. 224 is a form jury instruction that describes the manner in which the jury is to consider circumstantial evidence that the prosecution offers to prove facts necessary to find a

27

defendant guilty. . .. [¶] CALCRIM No. 225 is a form jury instruction that describes the manner in which the jury is to consider circumstantial evidence that the prosecution offers to prove a defendant's intent or mental state.' " (*People v. Covarrubias* (2015) 236 Cal.App.4th 942, 953.)

Although the question whether Jacinto harbored an intent to kill (with deliberation and premeditation) was the only disputed issue for count 2, on this record, there is no reasonable likelihood that, under the instant instructions, Jacinto's jurors misrelied on the circumstantial evidence when deciding whether Jacinto was guilty of attempted murder. "CALCRIM Nos. 224 and 225 provide essentially the same information on how the jury should consider circumstantial evidence, but CALCRIM No. 224 is more inclusive." (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1172 (*Samaniego*).) Given that the prosecution offered circumstantial evidence to prove both Jacinto's intent to kill for the purpose of counts 1 and 2 and his identity for the purpose of counts 1 and 4, the trial court properly decided that the more general, inclusive instruction under CALCRIM 224 was appropriate and that that instruction correctly informed the jurors about their reliance on circumstantial evidence for all counts. (See *People v. Hughes* (2002) 27 Cal.4th 287, 347 ["Because mental state or specific intent was not the only element of the case resting upon circumstantial evidence, the trial court did not commit error by providing only the more inclusive instructions."]; *Contreras, supra,* 184 Cal.App.4th at p. 592; *Samaniego, supra,* 172 Cal.App.4th at p. 1172; see also Judicial Council of Cal., Crim. Jury Instns. (2025) Bench Notes to CALCRIM Nos. 224 & 225, pp. 53, 55–56.)

In any event, even assuming arguendo that the trial court should have provided the jurors CALCRIM 225, that error was harmless as to count 2 under either *People v. Watson* (1956) 46 Cal.2d 818, or the more stringent

harmlessness test in *Chapman v. California* (1967) 386 U.S. 18.  Counsel for the parties properly described the way the jurors could use circumstantial evidence in their deliberation including on the mental state issues. Moreover, the evidence showing that Jacinto harbored an intent to kill Kristy was not insubstantial.  Jacinto retrieved a large knife from the kitchen and shortly thereafter stabbed Kristy in her right, upper abdomen.  (See *People v. Bolden* (2002) 29 Cal.4th 515, 561 ["defendant could have had no other intent than to kill" when he plunged a knife deeply into a "vital area of the body of an apparently unsuspecting and defenseless victim"]; *In re M.S.* (2019) 32 Cal.App.5th 1177, 1185 ["Evidence of intent to kill may be satisfied by proof of a single stab wound that penetrates a vital organ."].)  Because the trial court provided the more inclusive instruction under CALCRIM 224 (covering all the circumstantial evidence), its failure to additionally provide the more specific CALCRIM 225 instruction regarding intent or mental state was not prejudicial error.  (See *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1142, overruled on other grounds in *People v. Leon* (2020) 8 Cal.5th 831, 848; *Samaniego*, *supra*, 172 Cal.App.4th at p. 1172.)

Likewise, given that the instant jury instructions were correct and adequately informed the jurors about their reliance on circumstantial evidence and the reasonable doubt standard, the failure to instruct with CALCRIM 225 did not render Jacinto's trial or sentencing unfair, violate due process, or relieve the prosecution of its burden to prove Jacinto's guilt on all requisite elements.

D. *Nevada Robbery Conviction*

Jacinto contends that the trial court erred in its determination that his Nevada conviction qualified as a strike prior and serious felony conviction.

## 1. Additional Background

The amended information alleged that Jacinto had suffered a prior serious or violent felony ("strike") (§§ 1170.12, subd. (b); 667, subd. (d)) based on a 2014 Nevada conviction for robbery (Nev. Rev. Stat. 200.380) committed with the use of a deadly weapon (Nev. Rev. Stat. 193.165). In briefing submitted to the trial court, the prosecution contended that, although the Nevada robbery conviction alone would not necessarily constitute a strike under California law, the associated enhancement based on the use of a weapon did so. The prosecution requested that the trial court take judicial notice of certified court records associated with Jacinto's Nevada conviction—namely the information, Jacinto's signed waiver of preliminary examination, his written guilty plea form (titled a "guilty plea memorandum"), the judgment and associated minute order, and the transcript of his sentencing hearing.

In the guilty plea memorandum, Jacinto acknowledged he was knowingly pleading guilty to robbery with the use of a deadly weapon, a felony violation of Nevada Revised Statutes sections 200.380 and 193.165. Paragraph No. 4 of the memorandum states, "I understand the charge(s) against me and that the elements of the offense(s) which the State would have to prove beyond a reasonable doubt at trial are that on November 7, 2013, or thereabout, in the County of Washoe, State of Nevada, I did, individually and in joint participation with [my codefendant], willfully and unlawfully take personal property, to wit: an Apple iPhone, wallet, and lanyard from the person and/or in the presence of [A.P.[14]] at or near Brinkby Avenue and Lymberry Street, Reno, Washoe County, Nevada, against his

---

[14] The full name of the victim appears in the Nevada document. We use the victim's initials in accordance with rule 8.90(b)(4).

will, and by means of force or violence or fear of immediate or future injury to his person, and with the use of a black handgun, which I displayed while demanding [A.P.]'s property." Paragraph No. 17 of the form states "I do hereby swear under penalty of perjury that all of the assertions in this written plea agreement document are true." Jacinto's signature appears on the form.

In his briefing in the trial court, Jacinto agreed with the People that the Nevada robbery conviction alone did not constitute a strike under California law. Further, Jacinto contended that the Nevada enhancement for use of deadly weapon did not render the Nevada prior a strike because Nevada does not require that the defendant intentionally "do[] the proscribed act(s)." Jacinto requested that the trial court find that his prior conviction under Nevada law for robbery with a deadly weapon does not qualify as a strike and the allegations under sections 1170.12 and 667 not true.

The trial court conducted a bench trial on the strike prior and serious felony enhancement allegations. The court admitted into evidence without objection documents related to Jacinto's prior Nevada conviction, including his signed guilty plea memorandum.

The trial court found that, because robbery in Nevada is a general intent crime, "conviction of the robbery prior in California alone does not constitute a strike prior in California." The court noted that section 1192.7, subd. (c)(22) provides that " 'any felony or attempted felony where the defendant personally uses a deadly or dangerous weapon is a serious or violent offense in California, also known as a strike prior.' " Nevada Revised Statutes section 193.165 states that " 'any person who uses a firearm or other deadly weapon in the commission of a crime shall, in addition to the term of imprisonment prescribed by statute for the crime, be punished for

imprisonment in the state prison for a minimum term of not less than one year and a maximum term of not more than 20 years.' "  The court observed that section 12022, subdivision (b)(1) is "nearly identical" to Nevada Revised Statutes section 193.165.

The trial court found that Jacinto's guilty plea memorandum included the factual recitation quoted above.  The court concluded that it could rely on these admissions when making its determination whether the conviction qualified as a strike prior.  Based on Jacinto's admission that he displayed a handgun while demanding the victim's property in the course of the robbery, the court found that the Nevada conviction constituted a strike prior under section 1192.7, subdivision (c).  The court further concluded that the prosecution had proven beyond a reasonable doubt that Jacinto had suffered a strike prior and a prior serious felony.  It found both allegations true.

On appeal, Jacinto argues the trial court erred in finding that his Nevada prior conviction constitutes a strike prior.  Relying on the element of "personal use" in the context of section 12022, subdivision (b)(1) as "intentionally . . . [d]isplay[ing] the weapon in a menacing manner" (CALCRIM No. 3145), Jacinto asserts that nothing in the elements of Nevada Revised Statutes section 193.165 or in Jacinto's admissions on the plea form "describes intentional conduct or displaying a weapon in a menacing manner."

The Attorney General responds that the elements of section 12022, subdivision (b)(1) are irrelevant to whether the trial court committed error in determining Jacinto's prior conviction constitutes a strike.  In finding the strike prior true, the trial court relied on section 1192.7, subdivision (c)(23), which provides that "any felony where the defendant personally used a dangerous or deadly weapon" is a serious felony.  The Attorney General

maintains that " ' "use" ' " of a weapon under section 1192.7, subdivision (c)(23) means to " 'employ an object extrinsic to the body.' " Nevada Revised Statutes section 193.165(1) has a similar meaning, where " 'use' " means " 'to put into action or service' " and " 'to carry out a purpose or action by means of.' " (*Moore v. State* (2001) 117 Nev. 659, 662.) Given these similar meanings, the Attorney General asserts the trial court did not err in finding that Jacinto's Nevada conviction constitutes a strike prior.

   2.  <u>Legal Principles</u>

 "Under California's Three Strikes law, a defendant's sentence is enhanced upon proof that the defendant has been previously convicted of a 'strike'—a violent felony as defined in section 667.5, subdivision (c), or a serious felony as defined in section 1192.7, subdivision (c)." (*People v. Denard* (2015) 242 Cal.App.4th 1012, 1024.) " 'In order for a prior conviction from another jurisdiction to qualify as a strike under the Three Strikes law, it must involve the same conduct as would qualify as a strike in California.' " (*People v. Woodell* (1998) 17 Cal.4th 448, 453 (*Woodell*).) Under section 667, subdivision (a), which sets out an enhancement that adds a five-year consecutive term for a prior, serious felony, " 'serious felony' means a serious felony listed in subdivision (c) of Section 1192.7." (§ 667, subd. (a)(4).)

 In *Woodell*, the California Supreme Court examined whether the records from a North Carolina conviction showed that the prior conviction qualified as a prior strike under section 1192.7, subdivision (c)(23)—the same provision at issue here. Our Supreme Court stated, "To qualify for the sentencing scheme at issue here, that conviction must be for a 'felony in which the defendant personally used a dangerous or deadly weapon.' (Pen. Code, § 1192.7, subd. (c)(23).) The weapon use must be personal, not

vicarious; aiding and abetting another who used a deadly weapon would not suffice." (*Woodell*, *supra*, 17 Cal.4th at p. 453, italics omitted.)

In making factual findings related to a prior conviction, the trial court "is permitted to identify those facts that were . . . admitted by the defendant in entering a guilty plea." (*People v. Gallardo* (2017) 4 Cal.5th 120, 124; see also *People v. Hiller* (2023) 91 Cal.App.5th 335, 348 ["[T]he admissions a defendant made in entering a guilty plea may . . . properly be used in considering the effect of a prior conviction."].) However, the court "may not rely on its own independent review of record evidence to determine what conduct 'realistically' led to the defendant's conviction." (*Gallardo*, at p. 124.)

### 3. Analysis

In the guilty plea memorandum for his Nevada conviction, Jacinto admitted under penalty of perjury that he individually took personal property from the victim, against the victim's will "by means of force or violence or fear of immediate or future injury to [the victim's] person and with the use of a black handgun, which [he] displayed while demanding [the victim's] property." Jacinto also admitted he committed the crime of robbery, a felony.

We decide that these factual admissions establish that Jacinto committed the "same conduct" (*Woodell, supra,* 17 Cal.4th at p. 453) as that proscribed by section 1192.7, subdivision (c)(23). Under the latter provision, "[t]o 'use' a 'weapon' means the use or employment of an object extrinsic to the body." (*People v. Davis* (1996) 42 Cal.App.4th 806, 815.) "The language used in section 1192.7, subdivision (c)(23) makes a conviction . . . a serious felony only if a deadly weapon is personally used by the defendant." (*People v. Williams* (1996) 50 Cal.App.4th 1405, 1411–1412.) The facts Jacinto admitted in his guilty plea memorandum establish that he personally used a firearm in the commission of a felony, and therefore that he engaged in

34

conduct that constitutes a serious felony under California law, triggering both the Three Strikes law and the serious felony enhancement in section 667, subdivision (a).

We agree with the Attorney General that Jacinto's arguments related to the requirement in section 12022, subdivision (b) that the weapon be displayed "in a menacing manner" are beside the point. As our Supreme Court has stated, "[U]nder subdivision (c)(23) [of section 1192.7], 'any felony'—including assault with a deadly weapon—may be found to constitute a serious felony if the prosecution properly pleads and proves that defendant personally used a deadly or dangerous weapon in the commission of the offense. Although the prosecution may establish the elements required by subdivision (c)(23) by pleading and proving a separate section 12022, subdivision (b) enhancement, a section 12022, subdivision (b) enhancement is not a necessary prerequisite to the application of subdivision (c)(23)." (*People v. Equarte* (1986) 42 Cal.3d 456, 465.) We discern no error in the trial court's conclusion that Jacinto's prior Nevada conviction constitutes a strike under the Three Strikes law and a serious felony under section 667, subdivision (a).

E. *Strike Prior and Sentencing Enhancements*

Jacinto argues that the trial court abused its discretion in denying his request to strike his strike prior under *Romero*, *supra*, 13 Cal.4th 497 because the trial court relied on factors enumerated in section 1385, subdivision (c) (hereafter section 1385(c)), which applies only to dismissal of enhancements. Jacinto contends that the trial court's decision with respect to his *Romero* motion was "dominated and irredeemably tainted by the erroneous application of [section] 1385(c)."

Jacinto maintains that this asserted error was prejudicial because, had the court considered the "proper test" rather than the "irrelevant 'endanger

public safety' inquiry under [section] 1385(c)," it would have been at least "reasonably likely" that the trial court would have granted the *Romero* motion.

Jacinto further contends that the trial court erred in its application of section 1385(c) because it failed to specifically address the factor that multiple enhancements were alleged that would result in a sentence over 20 years and because the court's public-safety inquiry was not "forward-looking," as required by *People v. Gonzalez* (2024) 103 Cal.App.5th 215, 228 (*Gonzalez*).

Jacinto asserts that the trial court's alleged error with respect to the application of section 1385(c) is cognizable on appeal, notwithstanding his failure in the trial court to request dismissal of any enhancements under section 1385(c). In arguing against forfeiture, Jacinto cites three considerations: the language of section 1385(c), which (in Jacinto's view) requires the court to consider dismissal even in the absence of any motion; that the prosecutor addressed section 1385(c) in its sentencing memorandum; and the trial court's reference to section 1385(c) factors in its *Romero* decision.

The Attorney General responds that the trial court properly considered the age of Jacinto's strike prior when considering Jacinto's *Romero* motion in addition to other relevant facts and did not abuse its discretion in denying the motion under section 1385, subdivision (a) (hereafter, section 1385(a)). The Attorney General acknowledges that in articulating its decision denying the *Romero* motion, the trial court referenced " 'dismissing the enhancement' " and " 'public safety' " considerations, which are applicable to dismissals of enhancements under section 1385(c) (rather than to section 1385(a)) but contends these do not constitute reversible error.

36

The Attorney General points out that, apart from the *Romero* motion, section 1385(c) was relevant to the trial court's decision whether to dismiss Jacinto's serious felony enhancement (§ 667, subd. (c)). The Attorney General asserts that any error in the trial court's consideration of section 1385(c) factors was harmless as there is "no chance" the trial court would have granted the *Romero* motion given the inherent dangerousness of Jacinto's strike prior and the severity of Jacinto's instant offenses and vulnerability of his victims.

As for Jacinto's assertion that the trial court abused its discretion under section 1385(c) in failing to dismiss the enhancements, the Attorney General contends that Jacinto has forfeited this claim by failing to request their dismissal in the trial court and that Jacinto has not shown an abuse of discretion.

1. Additional Background

Prior to sentencing, Jacinto filed in the trial court a request pursuant to *Romero* and *People v. Carmony* (2004) 33 Cal.4th 367 (*Carmony*) that the court exercise its authority under section 1385(a) to dismiss his strike prior. In his written *Romero* request, Jacinto relied on section 1385(c). Jacinto's entire substantive *Romero* argument reads as follows: "The strike offense from 2014 is approximately nine years old. Penal Code [section] 1385(c)(3)(H) suggests that the court shall afford great weight to this factor. Accordingly, the court should dismiss Mr. Jacinto's nine year old strike offense. [¶] For the above reasons, it is in the interest of justice for this [c]ourt to strike the prior strike conviction pursuant to Penal Code section 1385(a)."

Apart from referencing section 1385(c) in the *Romero* request, Jacinto did not ask the trial court under section 1385(c) to dismiss at sentencing any of the enhancements that had been found true against him.

In its sentencing memorandum filed before trial, the prosecution argued that the trial court should decline under section 1385(c) to dismiss any of the enhancements. The prosecution acknowledged that multiple enhancements had been found true, which would result in a sentence of over 20 years, triggering the application of section 1385(c). However, the prosecution "urge[d] the [c]ourt to find that there is a likelihood that the dismissal of the enhancements would result in physical injury or serious danger to others, and therefore decline to strike the enhancements on the basis that doing so would endanger public safety."

The prosecution requested that the trial court impose a total sentence of 28 years four months, consecutive to 25 years to life. The prosecution did not specifically address Jacinto's request under section 1385(a) that the court dismiss his strike prior.

At the sentencing hearing, both Jacinto and the prosecutor submitted on their sentencing briefs. The trial court indicated that it had read Jacinto's *Romero* motion and had considered his request based on the age of the prior strike. The court found that Jacinto's strike prior was for robbery with the use of a firearm, "a particularly violent offense," and Jacinto had been "incarcerated most of the period of time" between the strike prior and his current offense. The court found that dismissing the strike prior (which it referred to as "an enhancement") would endanger public safety. The court further found "a substantial likelihood that the dismissal of the enhancement would result in physical injury and other serious danger to others." The court concluded that "[a] review of the nature and circumstances of Mr. Jacinto's

38

present felony convictions and prior violent felony conviction and the particulars of his background, character, and prospects indicates that Mr. Jacinto does not fall outside of the scheme['s] spirit in whole or in part." The court stated that it would "respectfully deny the request to dismiss [Jacinto's] strike prior."

Prior to articulating its sentence on each count of conviction and enhancement, the trial court made general observations about the nature of Jacinto's crimes and their effect on the victims. The court found that Jacinto "took an untraceable firearm to a homeless encampment and opened fire into a dark tent that was occupied by a naked, si[ght]-impaired,[15] unarmed man. [¶] . . . [¶] The defendant opened fire[] into an area used by members of the homeless population, which includes individuals who are particularly vulnerable. [¶] . . . Mr. Ledesma's last moments were agonizing. He tried to reach safety next door but he failed. He screamed in pain in the dirt and his life could not be saved."

The trial court additionally found that, later the same day, after he had shot Ledesma, Jacinto stabbed Kristy, who had done nothing to provoke him. To the contrary, Kristy had invited him for a meal and to change his clothes. Kristy almost died from her wounds, was in the hospital for weeks, and underwent multiple surgeries. The court found "[h]er life and her health will never be the same."

With respect to the enhancement on count 1 (§ 12022.53, subd. (d)), the trial court exercised its discretion not to strike it. In declining to strike the enhancement under section 1385(c), the court found "this was a callous murder. The victim was ambushed while naked in his tent. He was in a

---

[15] Jane Doe had testified at trial to her belief that Ledesma "couldn't see that good" and to being told by Ledesma that he was legally blind.

particularly vulnerable state. The [c]ourt finds that dismissing the enhancement would endanger public safety. There is a substantial likelihood that the dismissal of the enhancement would result in physical injury and other serious danger to others." Citing the same reasons, the court declined to strike the two enhancements on count 2, the enhancement on count 3 (although it did stay it pursuant to section 654), and the five-year enhancement for a prior serious felony.

With respect to each of its discretionary sentencing choices when crafting Jacinto's sentence, the trial court imposed the maximum possible penalty by selecting the upper term and declining to strike any enhancements.

    2. <u>Analysis</u>

       a. Section 1385(a)

Section 1385(a) states in relevant part that a "judge or magistrate may, either on motion of the court or upon the application of the prosecuting attorney, and in furtherance of justice, order an action to be dismissed." Discretionary dismissal under that subdivision may include a strike prior conviction. (*Romero*, *supra*, 13 Cal.4th at pp. 530–531; *People v. Williams* (1998) 17 Cal.4th 148, 151 (*Williams*).) The sentencing court must determine whether "the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." (*Williams*, at p. 161.)

We review the trial court's ruling for abuse of discretion. (*Williams*, *supra*, 17 Cal.4th at p. 152.) The burden is on the party attacking the sentence to clearly show that the sentencing decision is irrational, arbitrary, or contrary to law. (*Carmony*, *supra*, 33 Cal.4th at p. 376.) Absent such a

showing, we presume the trial court acted to achieve legitimate sentencing objectives, and we will not set aside its discretionary determination. (*Id.* at pp. 376–377.)

We must presume the trial court knew and correctly applied the law. (*People v. Gillispie* (1997) 60 Cal.App.4th 429, 434.) Although in some cases this presumption can be overcome by the record, this is not one of those cases. The court confirmed its understanding of the law when it declined to strike Jacinto's prior strike, stating that "[a] review of the nature and circumstances of Mr. Jacinto's present felony convictions and prior violent felony conviction and the particulars of his background, character, and prospects indicates that Mr. Jacinto does not fall outside of the scheme['s] spirit in whole or in part."

The trial court used the appropriate standard when considering whether to exercise its discretion under section 1385(a). (See *Williams, supra,* 17 Cal.4th at p. 161 ["[I]n ruling whether to strike or vacate a prior serious and/or violent felony conviction allegation or finding under the Three Strikes law, on its own motion, 'in furtherance of justice' pursuant to Penal Code section 1385(a), or in reviewing such a ruling, the court in question must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies."].)

Nevertheless, Jacinto asserts reversible error based on the trial court's reference to the strike prior as an "enhancement" and its allusion to section 1385(c). We agree with Jacinto that section 1385(c) does not apply to the

41

Three Strikes law, which sets out an alternative sentence scheme and is not an "enhancement." (*People v. Killian* (2024) 100 Cal.App.5th 191, 217; see also *People v. Burke* (2023) 89 Cal.App.5th 237, 243.) However, the trial court's stray reference to an "enhancement" does not lead to the conclusion that it legally erred in considering whether to strike Jacinto's strike prior. It was Jacinto himself who proposed the relevance of these factors to the *Romero* analysis in his written request. Further, Jacinto did not object to the trial court's reference to this terminology in the trial court, arguably resulting in the forfeiture of this point on appeal.[16]

Nevertheless, we do not rely on forfeiture to decide this issue. Instead, we decide Jacinto has not carried his burden of showing reversible error. We see no plausible basis for prejudice here, even if the trial court erred by referring to the strike prior as an "enhancement." Jacinto on appeal vaguely asserts that it is "reasonably likely" the court would have granted his *Romero* motion if it had not considered the section 1385(c) "public safety" factors. This unelaborated assertion fails to persuade.

Neither Jacinto on appeal nor his counsel in the trial court identified *any* basis (other than the age of the strike prior, which, without more, is not a lawful consideration[17]) for finding him outside the spirit of the Three Strikes law. The probation report similarly identified no mitigating factors

---

[16] Jacinto does not claim ineffective assistance of counsel on these points, noting that these claims "are better suited for habeas litigation."

[17] See *People v. Dain* (2025) 115 Cal.App.5th 235, 248 ["Section 667, subdivision (c)(3) (section 667(c)(3)), of the Three Strikes law expressly provides, 'The length of time between the prior serious or violent felony conviction and the current felony conviction *shall not* affect the imposition of sentence.' (Italics added; see § 1170.12, subd. (a)(3) [same].) . . . Thus, under section 667(c)(3), the bare fact that a prior strike conviction is over five years old cannot be the basis for dismissing the strike."]

applicable to Jacinto other than that the strike prior was over five years old. We do not perceive any factors in the record before us that would have supported dismissal of the strike prior.

The trial court dwelt at length on the cruelty and unjustifiable nature of Jacinto's crimes of conviction, the dangerousness of his prior conviction, and the short period of time Jacinto remained crime-free between his release from prison and his commission of the instant offenses. Given the absence of any mitigating factors in the record, the trial court could not have reasonably reached any other conclusion with respect to dismissal of the strike prior. We reject Jacinto's claim of prejudicial error in the trial court's decision not to strike his strike prior conviction under section 1385(a).

b. Section 1385(c)

As summarized by our Supreme Court, "Section 1385, subdivision (c)(1), as added by Senate Bill No. 81, provides that '[n]otwithstanding any other law, the court *shall dismiss an enhancement if it is in the furtherance of justice to do so*, except if dismissal of that enhancement is prohibited by any initiative statute.' (Italics added.) Section 1385, subdivision (c)(2) provides in pertinent part, '*In exercising its discretion under this subdivision*, the court shall consider and afford *great weight* to evidence offered by the defendant to prove that any of the mitigating circumstances in subparagraphs (A) to (I) are present. Proof of the presence of one or more of these circumstances *weighs greatly in favor of dismissing the enhancement*, unless the court finds that dismissal of the enhancement would endanger public safety.' (Italics added.)" (*People v. Walker* (2024) 16 Cal.5th 1024, 1032.) Under section 1385(c), "absent a finding that dismissal would endanger public safety, a court retains the discretion to impose or dismiss enhancements provided that

43

it assigns significant value to the enumerated mitigating circumstances when they are present." (*Walker*, at p. 1029.)

The Attorney General asserts that Jacinto forfeited any claim of error under section 1385(c) because in the trial court he did not request dismissal of any enhancement on that basis. We decline to apply the forfeiture doctrine, because the prosecutor's sentencing memorandum asserted that section 1385(c) applied, and the trial court explicitly elected not to dismiss any enhancements under that provision.

We review the trial court's decision to decline to dismiss enhancements under section 1385(c) for abuse of discretion. (See *People v. Mendoza* (2023) 88 Cal.App.5th 287, 298; *Carmony*, *supra*, 33 Cal.4th at p. 375.)

Jacinto asserts error on the basis that the trial court did not explicitly reference one of the relevant section 1385(c) factors (that the enhancements would result in a sentence over 20 years). The failure by the court to orally identify one of the factors, without more, does not constitute reversible error. "[N]o particular language [is] required for the trial court to decline to dismiss [the enhancements]. Section 1385, subdivision (a), requires a trial court to state its 'reasons for the dismissal . . . orally on the record,' but there is no similar statutory requirement when a court denies a request to dismiss an enhancement." (*People v. Bravo* (2025) 107 Cal.App.5th 1144, 1157.)

Relying on *Gonzalez*, *supra*, 103 Cal.App.5th 215, Jacinto additionally asserts that the trial court erred because it did not conduct a "forward-looking" inquiry into whether striking the enhancement would endanger public safety. In *Gonzalez*, the defendant argued that the trial court committed error by "focusing on whether [Gonzalez] 'presently' and 'currently' endangered public safety rather than assessing whether, looking forward, public safety would be endangered due to an earlier release from

44

prison (i.e., in 50 years to life rather than in 75 years to life) if the enhancement was dismissed." (*Gonzalez*, at p. 224.)

The *Gonzalez* court determined "the trial court erred because it considered *only* whether Gonzalez *currently* posed a danger to the public when assessing if a dismissal of the firearm enhancement would 'endanger public safety.' " (*Gonzalez*, *supra*, 103 Cal.App.5th at p. 230, italics added.) The trial court had "specifically explained, 'I think presently [Gonzalez] does represent a danger to society, *and for that reason* . . . I do think it is appropriate for the Court to impose an additional 25 years to life for the gun use enhancement.' " (*Id*. at p. 231.) Because the trial court in *Gonzalez* relied on that single factor for its decision, and "gave no indication of how it would rule if it did not limit its inquiry to Gonzalez's current dangerousness" (*ibid*.), the Court of Appeal concluded that the trial court's error was prejudicial. (*Id*. at p. 232.)

The trial court's comments at the sentencing hearing here do not demonstrate it interpreted section 1385(c) in the manner rejected by the appellate court in *Gonzalez*. In contrast to the facts of *Gonzalez*, the court considered Jacinto's criminal, parole, and incarceration history, as well as his current offenses, his character, and his prospects. Nor do the trial court's remarks reflect that it expressly limited its analysis to Jacinto's current dangerousness. (Cf. *Gonzalez*, *supra*, 103 Cal.App.5th at p. 224.) The trial court did not specify, let alone limit, the temporal nature of Jacinto's risk to public safety. We are not persuaded the trial court erred in its application of section 1385(c).

Even if the trial court failed to properly consider Jacinto's possible dangerousness at the time of his eventual release if he were sentenced to a lesser term, we would find any error harmless. The *Gonzalez* court stated, "it

45

is conceivable that, if the trial court holds a new sentencing hearing in which it does not limit its inquiry to [the defendant]'s current dangerousness, it will decide to exercise its discretion under section 1385, subdivision (c)(2) in a different manner." (*Gonzalez, supra,* 103 Cal.App.5th at p. 231.) On this record, we decide there is no likelihood the court would have exercised its discretion differently. We reject Jacinto's assertion that the trial court committed prejudicial error under section 1385(c).

F. *Section 654 and Count 4*

Jacinto contends the trial court erred under section 654 by imposing an unstayed sentence on count 4 (possession of a firearm by a felon; § 29800, subd. (a)(1)), given its imposition of sentence on count 1 (the murder of Ledesma; § 187, subd. (a)). Jacinto asserts that the prosecution offered no evidence that he purchased the firearm or brought it to the crime scene. Further, he contends the evidence showed that he disposed of the weapon immediately after the shooting. Because no substantial evidence showed that the possession of the firearm was separate from the primary offense of murder, the court erred in not staying the sentence on count 4.

The Attorney General responds that the trial court did not err. He maintains there is substantial evidence that Jacinto intentionally had the gun under his control from the time he arrived at the encampment and used it to intentionally shoot and kill Ledesma, leaving the cartridge casings behind but not the gun. After the murder, Jacinto continued to possess the gun. Jacinto took it with him as he walked down the alley and then discarded it to successfully escape the murder scene and avoid being a felon caught with a gun. As Jacinto unlawfully possessed a gun before, during, and after committing the murder in which he used the gun, section 654 does

not prohibit separate punishment for both of his crimes. In reply, Jacinto argues that no substantial evidence supports these factual assertions.

### 1. Additional Background

At the sentencing hearing, Jacinto's defense counsel argued that count 4 "is . . . [section] 654 to [c]ount 1 as the possession elements of [c]ount 4 are, by inference, contained within the special allegation and the actual elements of" count 1. Counsel requested that the trial court stay the punishment on count 4. The prosecutor disagreed that section 654 applied to the sentence on count 4. The court elected to impose an unstayed sentence on count 4. In explaining its decision, the court stated that it "does not find that this count is [section] 654 with [c]ount 1 as there [are] additional elements required for this count that are not required to—for either the substantive charge or the enhancement as to [c]ount 1."

### 2. Legal Principles

"Section 654 precludes multiple punishments for a single act or indivisible course of conduct." (*People v. Assad* (2010) 189 Cal.App.4th 187, 200.) Even concurrent sentences on convictions subject to section 654 are prohibited; the sentence on one of the two applicable convictions must be imposed and then stayed. (*People v. Deloza* (1998) 18 Cal.4th 585, 591–592.) "[T]he purpose of section 654 'is to insure that a defendant's punishment will be commensurate with his culpability.' " (*People v. Latimer* (1993) 5 Cal.4th 1203, 1211.)

Application of section 654 "requires a two-step inquiry, because the statutory reference to an 'act or omission' may include not only a discrete physical act but also a course of conduct encompassing several acts pursued with a single objective." (*People v. Corpening* (2016) 2 Cal.5th 307, 311.) Only if the case involves more than one act does a court consider whether the

47

case involves a course of conduct. (*Ibid*.) "At step one, courts examine the facts of the case to determine whether multiple convictions are based upon a single physical act." (*Id*. at p. 312.) "Whether a defendant will be found to have committed a single physical act for purposes of section 654 depends on whether some action the defendant is charged with having taken separately completes the actus reus for each of the relevant criminal offenses." (*Id*. at p. 313.) If the convictions involve more than one act, the court reaches "step two of the section 654 analysis: whether the [course of conduct] involved multiple intents and objectives." (*Id*. at p. 316.)

At step two, whether crimes arise from an indivisible course of conduct turns on the perpetrator's intent and objective. (*People v. Harrison* (1989) 48 Cal.3d 321, 335.) "If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." (*Neal v. State of California* (1960) 55 Cal.2d 11, 19, overruled in part on another ground in *People v. Correa* (2012) 54 Cal.4th 331, 341.) Whether a defendant harbored a single intent—and thus a single objective—is a factual question; the applicability of section 654 to settled facts is a question of law. (*Harrison*, at p. 335.) We review the record for substantial evidence to support implied findings sufficient to uphold the sentence under section 654. (See *People v. Osband* (1996) 13 Cal.4th 622, 730–731.)

With respect to the offense described in count 4 (felon in possession of a firearm), whether section 654 applies " ' "depends upon the facts and evidence of each individual case. Thus where the evidence shows a possession distinctly antecedent and separate from the primary offense, punishment on both crimes has been approved. On the other hand, where the evidence shows a possession only in conjunction with the primary offense, then punishment for the illegal possession of the firearm has been held to be

48

improper where it is the lesser offense." ' " (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143 (*Jones*).)

Multiple punishment is not appropriate where "the evidence 'demonstrates at most that fortuitous circumstances put the firearm in the defendant's hand only at the instant of committing another offense' " or the evidence shows only possession at the time of the shooting and incidental only to the objective of shooting the victim. (*Jones*, *supra*, 103 Cal.App.4th at p. 1144.) However, "[s]ection 654 is inapplicable when the evidence shows that the defendant arrived at the scene of his or her primary crime already in possession of the firearm." (*Id*. at p. 1145.)

3. <u>Analysis</u>

We decide that substantial evidence supports the trial court's implied finding that section 654 does not bar the imposition of an unstayed sentence on count 4. There is substantial evidence that Jacinto arrived at the homeless camp where he eventually shot Ledesma already in possession of the firearm. Jane Doe testified that she did not hear any arguing or shouting or anyone moving around the area of the tents at time of the shooting. The location data showed that Jacinto was in the vicinity of the scene for several minutes before the shooting and that within a very brief period, Jacinto approached Ledesma's tent, shot Ledesma, and fled. Based on this evidence, the trial court could infer that Jacinto brought the firearm to the scene rather than wresting it from Ledesma or fortuitously finding a loaded weapon near Ledesma's tent at the instant of the shooting.

We conclude the trial court did not err in imposing unstayed sentences on both counts 1 and 4.

G. *Cumulative Prejudice*

Having concluded *ante* that Jacinto's claims of error are without merit, we in turn reject his claim of cumulative prejudice resulting from the asserted errors. There is no prejudicial error to cumulate. (See *People v. Hensley* (2014) 59 Cal.4th 788, 818.)

H. *Corrections to Abstract of Judgment and Sentencing Minute Order*

Although not raised by Jacinto or the Attorney General, the abstract of judgment for Jacinto's indeterminate sentence (form CR–292; dated March 18, 2024) incorrectly states in section No. 1 that Jacinto was convicted on count 1 of "Murder second degree." That is incorrect. The jury returned a verdict finding Jacinto guilty of first degree murder (§§ 187, subd. (a), 189). To conform the abstract to the conviction, we direct the trial court to prepare a new abstract of judgment that indicates Jacinto's conviction of first degree murder.

## III. DISPOSITION

The judgment is affirmed. The trial court is directed to prepare a new abstract of judgment for the indeterminate sentence that indicates Jacinto was convicted on count 1 of first degree murder (Pen. Code, §§ 187, subd. (a), 189).

The trial court clerk is directed to forward a copy of the corrected abstract of judgment to the California Department of Corrections and Rehabilitation.

_____

Danner, J.

WE CONCUR:

_____

Greenwood, P. J.

_____

Bromberg, J.

**H051940**
***People v. Jacinto***